Argued and submitted April 12, affirmed August 7, reconsideration denied September 27, petition for review denied October 29, 1985 (300 Or 180)

# BLUNT,
*Respondent,*

*v.*

# BOCCI,
*Defendant,*

# TRAXLER et al,
*Appellants.*

(A8107-04182; CA A30498)

704 P2d 534

Thomas Sauberli, Portland, argued the cause for appellants. With him on the briefs was Vergeer, Roehr & Sweek, Portland.

Marianne Bottini, Portland, argued the cause for respondent. With her on the brief was Bottini & Bottini, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

This case arose from a traffic accident in the early morning hours of September 7, 1980, when plaintiff was injured when his car collided head-on with a vehicle driving in his lane. Both occupants of the other vehicle were killed. Plaintiff sued the estate of the deceased driver to recover for his negligence and the Traxlers, who operated the Portsmouth Club, and the Portsmouth Club for serving the driver alcohol when he was visibly intoxicated. ORS 30.950.[1] The jury returned a verdict against all defendants for $140,000 in general damages and $5,000 in special damages and awarded $55,000 in punitive damages against the Traxlers and the Portsmouth Club, who appeal.

Nelson, the deceased driver, and Rheault, his companion and deceased passenger, were drinking beer in a tavern around 9:00 p.m. on the evening of September 6, 1980. At 10:00 p.m., they stepped outside the tavern to share a marijuana cigarette with two other friends. They then attended a party hosted by Rheault's parents, where Nelson consumed between one and four drinks. The pair then headed for the Portsmouth Club.

Scott Curran, who tended bar at the Portsmouth Club on that evening, testified that Nelson and Rheault entered the club around 12:00 or 12:30 a.m. and that they appeared to be "high on downers" at that time. His testimony reads, in part:

"Q.  * * * Now, when Mr. Nelson came into the bar, did you form an opinion as to whether he was under the influence of any intoxicants?

"A.  He looked like he had been out partying that night.

"Q.  Did he appear to have been under the influence of alcohol or drugs or both?

"A.  Something, I don't know what.

"Q.  When he came in, was he sober?

---

[1] ORS 30.950 provides:

"No licensee or permittee is liable for damages incurred or caused by intoxicated patrons off the licensee's or permittee's business premises unless the licensee or permittee has served or provided the patron alcoholic beverages when such patron was visibly intoxicated."

"A.   Not like he just got up, he had had something, I don't know what."

Curran served the pair at least two, and possibly three, drinks each, although they appeared to him to be "high," but not intoxicated on alcohol, when served. Curran testified that he would not have served them any drinks if he had known that they planned to drive to Kah-Nee-Ta resort later that evening. He also observed them smoking marijuana outside the club at approximately 1:00 a.m., apparently after he had served them drinks. Another witness present at the club that evening testified that Nelson and Rheault looked "stoned" when they were at the club.

Beth Traxler, daughter of defendants Traxler and night manager of the club in September, 1980, testified that she also served Rheault and his companion, whom she could not identify as Nelson, two drinks each on that evening. They were both drinking medium-strength "free-poured" mixed drinks, containing approximately one and one-half ounces of liquor. She testified that Curran had "a drug and alcohol problem" and that it was her opinion that he was "on drugs and alcohol" that evening. She allowed him to work as bartender that evening despite her belief that he was using drugs and alcohol.[2]

Nelson and Rheault left the club at 2:30 a.m. and arrived at Rheault's apartment at 3:00 a.m. Witnesses testified that Nelson drove up to the front door, driving on the lawn for 20 feet and knocking over a bird bath. Rheault's brother-in-law, with whom Rheault lived, testified that he told Nelson he should not be driving in his condition. The pair left the apartment at 3:30 a.m., heading to Kah-Nee-Ta. The accident occurred at approximately 4:00 a.m. Nelson had a blood alcohol content of .19 percent when he died; that, of course, does not reflect any other drugs which he may have consumed. An expert testified that if Nelson had had his last drink at 2:00 a.m., his blood alcohol content at that time would have been approximately .21 or .22 percent. That would be caused by consuming approximately 11 ounces of liquor. He stated that when blood alcohol reaches .20 percent, individuals display "gross observable symptoms of intoxication

---

[2] OAR 845-06-045(1) prohibits bartenders from consuming or being under the influence of alcohol while on duty.

* * *; coordination-muscle imbalance, staggering, slurred speech * * *." In addition, he stated that the ingestion of marijuana or barbituates would tend to enhance the intoxication and its visibility.

■ Defendants raise five assignments of error. They first contend that punitive damages should not be allowed in actions under ORS 30.950. We have already decided the issue contrary to defendants' position, *Pfeifer v. Copperstone Restaurant and Lounge,* 71 Or App 599, 693 P2d 644 (1985), and we decline defendants' invitation to reconsider that decision.

■ Defendants' next contention is that the trial court erred in ruling that plaintiff produced sufficient evidence of wilful or wanton conduct to justify submitting the issue of punitive damages to the jury. Viewing the evidence most favorably to plaintiff, we conclude that the jury could have found that Nelson was visibly intoxicated when he entered the Portsmouth Club, that Curran recognized his condition but served him alcohol anyway and that Beth Traxler also served him alcohol when he was visibly intoxicated. A jury could also have found that Curran was intoxicated on that evening, in violation of an adminstrative rule. *See* n 2, *supra.* Curran's statement that he would not have served the pair any drinks if he had known that they planned to drive to Kah-Nee-Ta later also indicates a wilful or wanton disregard of his duty not to serve a visibly intoxicated person. That evidence indicates an aggravated disregard of defendants' duties, sufficient to justify submission of punitive damages to the jury. *Pfeifer v. Copperstone Restaurant and Lounge, supra,* 71 Or App at 608-09.[3]

■ In charging the jury, the trial court instructed that the term "visibly intoxicated" in ORS 30.950 includes "intoxication by alcohol or drugs or a combination thereof." Defendants contend that the instruction is erroneous and that the legislature intended "visibly intoxicated" to mean only intoxication by alcohol. We do not agree. In defining the crime of driving under the influence of intoxicants, the legislature specified three offending conditions:

"(1) A person commits the offense of driving while under

---

[3] Defendants also contend that the trial court erred in admitting evidence of their net worth. They concede that, if the issue of punitive damages was properly submitted to the jury, the evidence was appropriate.

the influence of intoxicants if the person drives a vehicle while the person:

"(a) Has .08 percent or more by weight of alcohol in the blood of the person as shown by chemical analysis of the breath or blood of the person made under ORS 487.805 to 487.835; or

"(b) Is under the influence of intoxicating liquor or a controlled substance; or

"(c) Is under the influence of intoxicating liquor and a controlled substance." ORS 487.540(1).

The legislature clearly recognized that the influence of controlled substances, either alone or in combination with liquor, is detrimental to driving ability. Interpreting the term "visibly intoxicated" as it is used in ORS 30.950 to include intoxication by controlled substances or alcohol or both gives effect to the legislative purpose to discourage driving while under the influence of any intoxicant or combination of intoxicants.

■    Defendants argue that bartenders are familiar with the symptoms of alcohol intoxication but not of drug intoxication, and that it is unfair to place on them the burden to determine if a customer is intoxicated by drugs other than alcohol. We do not think that the burden is severe. ORS 30.950 does not require a bartender to determine if a patron is *actually* under the influence of alcohol or a controlled substance. His duty is simply not to serve alcohol to a patron who *exhibits* symptoms of intoxication. If a patron has taken a controlled substance but does not exhibit symptoms of intoxication, the bartender and tavern owner do not risk liability by serving him. On the other hand, if a patron exhibits symptoms of intoxication from any source, a bartender should not contribute to the patron's further intoxication, and potential hazard on the road, by serving him alcohol.

■    Defendants' final assignment contends that the trial court erred by denying their motion for a mistrial, made after plaintiff's opening statement. Defendants claim that certain remarks made during plaintiff's opening statement referred to plaintiff's poverty and constituted a plea for sympathy which prejudiced defendants. The remarks of which defendants complain are contained and emphasized in the following passage:

"The other aspect of his wage loss is when he went into the

hospital April 22nd. He tried to get a job part time, to try to save money to go back to school the following year. He was not able to do that because of the time lost here, and from the surgery and convalescence through July of 1981. He was working part-time as a sales clerk at Meier & Frank, was taken off the job because of the surgery, and at that point in time or shortly after that time, *just came to the point where he didn't have enough money to go to school and his parents couldn't finish his tuition.*

"So, since that time, he's been working at Stereo Super Stores. For a while, he was a clerk where he tried to do retail work and that didn't work out because of his inability to stand for long periods of time. And so now, he has a job where he handles the phones for insurance claims. And the problems that he has at this point in time is that if he sits all day, he's fine, but *he would like to finish college. But as of now, he's attempting to earn the money to finish his last year because his parents can't finish it out for him.*" (Emphasis supplied.)

The trial court ruled that those statements had some relevance to plaintiff's case. To establish their relevance, counsel argued that plaintiff's parents had set aside money for his education, but could not so apply it after having to support plaintiff while he convalesced from his injuries caused by the accident. Plaintiff's attorney claimed that the remarks were relevant to the issues of plaintiff's lost wages and his attempt to mitigate damages. The trial court emphasized to the jury, before defendants' opening statements, that attorneys' opening statements are not evidence and that the jurors are to rely only on witnesses' testimony and exhibits.

The trial court did not abuse its discretion in denying defendants' motion. The remarks may have had some relevance, and any prejudicial effect was cured by the court's cautionary instruction. *See Haltom v. Fellows,* 157 Or 514, 524, 73 P2d 680 (1937). Even if the statements made in this case are considered a plea for sympathy, we do not think that they were so prejudicial as to require a mistrial.

Affirmed.